**BAKER INDUSTRIES, INC., Plaintiff,**

v.

**CERBERUS, LIMITED, Defendant.**

Civ. A. No. 82–526.

United States District Court,
D. New Jersey.

Sept. 12, 1983.

---

**2.** *See* discussion p. 1235, *supra.*

**1238**

Budd, Larner, Kent, Gross, Picillo & Rosenbaum by Michael M. Rosenbaum, Newark, N.J., for plaintiff.

Cravath, Swaine & Moore by John E. Beerbower, New York City, for defendant.

STERN, District Judge.

Plaintiff Baker Industries, Inc. (Baker) moves the Court to enter a judgment incorporating the findings of fact and conclusions of law of Special Master Richard G. Moser, who was appointed with the consent of Baker and defendant Cerberus, Limited (Cerberus) to decide finally and conclusively all matters raised in an arbitration involving the parties. Cerberus opposes the motion, contending that the master exceeded the scope of his reference by deciding issues not raised in the arbitration, made numerous legal errors which the Court is bound to correct despite the parties' stipulation that the Master's decision would be unreviewable by this or any other Court, and conducted hearings in a manner which violated Cerberus's right to the due process of law. Baker has also moved pursuant to 28 U.S.C. § 1927 for an order assessing its counsel fees, costs and expenses against Cerberus's counsel, Cravath, Swaine & Moore (Cravath), on the ground that Cerberus's objections to the Master's report and its opposition to the entry of a judgment based on the findings and conclusions in the report have unreasonably and vexatiously multiplied the proceedings.

For the reasons which follow, we find that the Master did not exceed the scope of his reference, that his findings of fact and conclusions of law are unreviewable on the merits by this or any other court, and that the proceedings before him in no way violated the right of Cerberus to the due process of law. We will therefore enter a judgment incorporating the master's findings and conclusions. We also find that the objections filed by Cravath on behalf of Cerberus to the entry of a judgment, except to the extent that they contend that the master has exceeded the scope of the reference, have unreasonably and vexatiously multiplied the proceedings, warranting the

assessment against Cravath of Baker's expenses in responding to the objections. In order to effectuate fully the policies of § 1927, Cerberus shall be enjoined from indemnifying Cravath for these expenses.

## I. *The History of the Proceedings*

Defendant Cerberus owns certain patent rights relating to the manufacture of ionization smoke detectors. On April 1, 1973, Cerberus entered into an agreement with Baker under which Cerberus granted Baker an exclusive twenty-year license to make, use and sell detector devices using Cerberus's patents in the United States, Canada and Mexico.[1] Article XV(C) of the agreement provides for arbitration of "[a]ny controversy or claim arising out of or relating to" the agreement and provides that judgment on the arbitration award may be entered in any court having jurisdiction. Ex. A to Aff. of Michael M. Rosenbaum, Apr. 6, 1983, at 28.

In December 1981, Cerberus sent Baker a telex stating that Baker's manufacture of the "DI–3" ionization detector violated Article VI(B) of the agreement, since Baker had not obtained Cerberus's consent to manufacture the device. Cerberus indicated that it would not consent to the manufacture of the DI–3 by Baker since the device was technically unsound and would impair the nature and quality of the detector device. Complaint, ¶ 21; Amended answer, ¶ 21; Counterclaim, ¶ 32. On February 22, 1982, Baker filed a demand for arbitration with the American Arbitration Association asserting that Cerberus had "wrongfully and in bad faith" declared a breach of the licensing agreement for the purpose of abrogating the exclusive license given to Baker. Ex. A to Baker's Response to Cerberus's Objections to the Report of Mr. Richard Moser ("Plaintiff's Response"). Baker claimed that Cerberus was wrongfully asserting a breach of both Article VI(B)

and the marking requirements of Article II(D) of the agreement, *id.,* and sought a determination that it had complied with Articles II(D) and VI(B) of the agreement in manufacturing, marking and selling its DI–3 detector, or, alternatively, that it should be permitted sixty days to conform with Article VI(B) should any breach of that provision be found. Baker also sought to restrain Cerberus permanently from terminating the agreement because of a violation of Article VI(B) as long as Baker did not alter the DI–3. *Id.*[2]

On February 23, 1982, Baker filed an action in the Superior Court of New Jersey, Chancery Division, Morris County, seeking an injunction restraining Cerberus from declaring a breach of the licensing agreement or from terminating the agreement until the arbitration proceeding demanded by Baker was concluded. Cerberus removed the action to this court pursuant to 28 U.S.C. §§ 1441(a) and 1332, and a hearing on Baker's application for a temporary restraining order preventing Cerberus from declaring a breach or terminating the agreement was held on February 24, 1982. At the hearing, the return date of the application was adjourned indefinitely on the agreement of Cerberus not to terminate the agreement without providing Baker at least 48 hours notice so that Baker could renew its motion for injunctive relief.

On March 31, 1982, Cerberus declared the licensing agreement terminated, effective April 7, 1982, because of Baker's conduct in the manufacturing and marketing of the DI–3. Ex. to Aff. of Francis P. Barron, Apr. 9, 1982. Cerberus proposed a stipulation governing the parties' conduct pending the outcome of the arbitration proceedings under which Cerberus would maintain the exclusivity of the license agreement and Baker would agree not to sell the DI–3 for certain "critical applications" and to notify its customers that Cerberus had not con-

---

**1.** The 1973 agreement supersedes an exclusive licensing agreement entered into by the parties' predecessors in interest on Jan. 17, 1951.

**2.** Baker also contended that Cerberus had breached the agreement by reason of an agree-

ment Cerberus had entered into with the Nittan Company. Apparently, this claim has not been pursued. Mem. of Cerberus, Ltd. in Opp. to Plaintiff's Application for Entry of an Order and Judgment ("Defendant's Mem.") at 29 n. 8.

sented to the manufacture or distribution of the device. *Id.* This offer was rejected, and Cerberus subsequently filed an amended answer and counterclaim, contending that the DI-3 was "technically unsound, unsafe and inferior," Counterclaim, ¶¶ 30–31, 51, that Cerberus would not consent to the manufacture of the device because of its technical deficiencies, *id.* at 32, and that Baker's manufacture and marketing of the DI-3 constituted a breach of the license agreement, a hazard to the public safety, and an impairment of Cerberus's trademark and goodwill. *Id.*, ¶¶ 46, 51–52, 56. Cerberus sought an injunction pending the completion of arbitration proceedings enjoining Baker from distributing the DI-3 and requiring Baker to inform purchasers of the DI-3 that Cerberus had not consented to its manufacture or sale. Cerberus also sought relief to be granted following the completion of arbitration proceedings on the grounds that the manufacture and sale of the DI-3 constituted patent infringement and unfair competition, that Baker's conduct under the licensing agreement violated the antitrust laws, that Baker had impermissibly obstructed a royalty audit that Cerberus had sought to conduct, and that Baker had defamed Cerberus and its products in its marketing of the DI-3. *Id.*, ¶¶ 63–68, 71, 74, 77, 80.

On April 12, 1982, a hearing was held on Baker's application to enjoin Cerberus from terminating the agreement. At this hearing, the Court stressed that the merits of the controversy—that is, whether Baker had in fact breached the agreement and whether, if so, that breach warranted a termination of the agreement—could not be resolved by the Court, because these matters had been committed by the parties for resolution by arbitration. Transcript of April 12, 1982 at 2–3, 7, 20, 30, 41, 57. Both counsel for Baker, *id.* at 3, 6, and counsel for Cerberus, *id.* at 7, 61, agreed. The Court specifically noted that the issue of the technical soundness of the DI-3 was, as all other issues

raised, a matter committed to the arbitrators, *id.* at 41, 59, and stated that the Court could have cognizance of this issue only to the extent that Cerberus's allegations about the safety of the device affected the public interest. *Id.* at 37, 42, 58–59. Counsel for Cerberus agreed with this proposition as well. *Id.* at 59–62. Counsel for Cerberus also acknowledged that the arbitrator would have the power to restore the status quo that existed before the declaration of breach if he found that the declaration of breach was unjustified. *Id.* at 7–8, 35. On the basis of this representation, *id.* at 37, on the basis of its view that it could not consider the merits of the dispute in deciding Baker's application, *id.* at 17, 57, and for the other reasons stated on the record, the Court denied Baker's application for an injunction pending the arbitration decision. The Court also signed an order requiring Baker to show cause why it should not be restrained from selling the DI-3 pending the outcome of the arbitration proceedings and required to notify its customers that Cerberus had not consented to the manufacture or sale of the DI-3.[3] The Court subsequently denied Baker's motion for reconsideration of the denial of its motion for injunctive relief, and after the denial of the request was made final, the judgment was affirmed by the United States Court of Appeals for the Third Circuit. *Baker Industries, Inc. v. Cerberus, Ltd.,* 692 F.2d 747 (3d Cir.1982).

On April 16, 1982, Cerberus filed its response to Baker's demand for arbitration. Cerberus denied the allegations contained in Baker's demand, stated that the dispute focused principally on Article VI(B), and sought an award determining that Baker's manufacture and distribution of the DI-3 with the Cerberus name and mark without complying with Article VI(A) and Article VI(B) of the agreement and without Cerberus's consent constituted a breach of the agreement, unfair competition and trade-

---

**3.** Although the order to show cause and the counterclaim sought restraints against any sale of the DI-3, defendant later modified its position to assert that the DI-3 was dangerous only when used in certain applications. Tr. of May 4, 1982 at 41; Tr. of May 20, 1982 at 14; Defendant's Preliminary Summary of Factual Contentions Regarding the DI-3 at 20.

mark infringement. Ex. B to Plaintiff's Response at 1–2, 8–9. The response stated that Cerberus had found the alterations in DI–3 to be "technically unsound." *Id.* at 5.[4] Cerberus also sought a determination that Baker had breached Article II(D) of the licensing agreement by failing to mark its detector devices properly; that Baker had breached Article III of the agreement by obstructing Cerberus's royalty audit and by failing to pay the proper amounts in royalties on the manufacture, sale and use of detector devices; that Baker had breached Article VI(B) by selling the DI–1A as a commercial detector and by using a potting compound not approved by Cerberus in manufacturing the DI–4A; that Baker's failure to give notice of its intention to manufacture other detector devices and to give its planned production output for those devices was a breach of Article VI(A); that Baker had breached the agreement by manufacturing the DP–3 detector with the Cerberus patented locking detector for ionization detectors; that Baker had breached the "best efforts" clause contained in Article XI of the agreement by falsely representing that Cerberus no longer made the DI–2 and by refusing to let Cerberus make sales of detector devices that Baker itself would not; that Baker's manufacture and sale of devices after the date that Cerberus declared the agreement terminated constituted patent and trademark infringement, trademark misuse and unfair competition; and that Baker had "generally . . . ignored the provisions of the Agreement." *Id.* at 8–10.

Over Baker's strenuous objections, this Court refused to terminate its inquiry as to whether the public interest required an injunction prohibiting Baker from marketing the DI–3 for certain applications. On May 20, 1982, the Court appointed an expert pursuant to Rule 706, Fed.R.Evid., for the purpose of rendering a report as to whether, given the present state of the art, the DI–3 as sold by Baker is unreasonably dangerous for any of the applications for which it is presently sold. On August 20, 1982, the court-appointed expert, Professor Howard W. Emmons, submitted a report concluding that for normal residential and office use, the DI–3 is a good detector and "may well be . . . among the best of the generally available U.S. detectors." Report on the Performance of the DI–3 Fire Detector at 15. Prof. Emmons also concluded, however, that "in critical uses where long term high reliability is important or where unusual environments in temperature, moisture, dust or corrosive vapors are encountered the DI–3 is not yet a proven reliable detector and in the interest of public safety should not used." *Id.* at 16.

On October 12, 1982, a hearing began on Cerberus's application for injunctive relief on the ground that the DI–3 constitutes a public hazard. On October 14, 1982, the hearing was adjourned and the parties entered into a stipulation of settlement. The parties agreed that all litigation between the parties except the arbitration proceeding would be stayed, that the arbitration would be dismissed, and that all issues pending before the arbitrators would be submitted to a master appointed by this court. Tr. of Oct. 14, 1982 at 2, 43. The parties agreed that the master would decide everything that the arbitrators had been empowered to decide, including the claims pleaded before the arbitrators and those matters relating to the claims pleaded which would have been cognizable by the arbitrators. *Id.* at 4–5, 10, 13. The parties were limited to the discovery which had been ordered by the arbitrators, *id.* at 15, with discovery disputes to be resolved by the master. Tr. of Nov. 3, 1982 at 52. The master was given a strict time schedule and was given the power to apportion the costs of the mastership. Tr. of Oct. 14, 1982 at 19–21, 30; Tr. of Nov. 3, 1982 at 9.

The parties readily stipulated that the master's findings of fact would be final.

---

**4.** On May 4, 1983, at a hearing on Baker's application to prevent Cerberus from issuing a press release, counsel for Cerberus contended that a statement in the release that "[a] dispute over the technical soundness of Pyrotronics' DI–3 detector has been submitted to arbitration" was "a true statement." Tr. of May 4, 1983 at 19. The Court agreed. *Id.* at 29.

Tr. of Oct. 14, 1982 at 23. After the Court suggested that jurisdictional difficulties could arise if the parties did not make the master's conclusions of law final, since the issues that the master was to decide were within the jurisdiction of the arbitrators rather than this Court, and after the Court noted that a stipulation that the master's conclusions of law would be final would have "the virtue of giving you a neutral, detached, fair-minded person who will hear the controversy and it will be done," counsel for Cerberus agreed that the master's conclusions of law as well as his findings of fact should be made final. *Id.* at 22–24.[5] The Court then noted that Federal Rules of Civil Procedure do not prohibit such a stipulation, that it could see no difficulty with the parties' waiver of whatever statutory rights of appeal that they might have, that the master's findings would not be final to the extent that he exceeded the scope of his reference, that the master would have full power to decide the issue of breach and remedy, and that the master's decision would not be reviewable by this Court or any other Court. At this point, counsel for Baker also agreed to stipulate that the master's conclusions of law would be final. *Id.* at 24–26. The Court stated that the parties' stipulation that the master's findings and conclusions would be unreviewable eliminated any difficulties stemming from the fact that the Court did not have jurisdiction over the merits of the controversy, since "[i]rrespective of questions of general jurisdiction, you will be bound by your stipulations as between each other." *Id.* at 26. After the parties and the Court agreed that the Court had jurisdiction to enforce the stipulation of the parties referring the issues then before the arbitrators to the master for a final determination, the Court noted that questions of jurisdiction were

relevant only to the extent that the Master's determinations implicated third parties. *Id.* at 28–29. The Court summarized the "intention of this agreement" as giving the parties "a faster, speedier, cheaper, hopefully, more competent way of arbitrating" their dispute while "freez[ing] everything else in place." *Id.* at 35.

On November 3, 1982, Richard G. Moser, Esquire, was appointed as the special master, with the transcript of the stipulation of settlement on October 14, 1982 serving as his order of reference. At the hearing at which Mr. Moser was appointed, the parties's stipulation that his determination would be unreviewable and that the Court therefore had no authority over him was underscored. The Court stated:

I cannot order Mr. Moser not to read anything. Under the terms of what we have agreed to, he is not under my authority. I think that's true.

As I remember the agreement, if he accepts the position, any appeal from him to me is solely on the issue of whether it is outside of the mandate. Any decision he makes within that is not reviewable here or anywhere.

Is that correct?

MR. ROSENBAUM: [Counsel for Baker]: That's correct.

MR. BEERBOWER: [Counsel for Cerberus]: That's correct.

Tr. of Nov. 3, 1982 at 3–4.[6] At the conclusion of the hearing, the Court found that a dispute over whether Baker would have to answer certain interrogatories propounded by Cerberus was to be resolved by the master. The Court stated:

This directly relates to his function. I'm not going to make the decision. This shapes the whole arbitration—Master-

---

5. Cerberus concedes that this consent was voluntarily given. Defendant's Mem. at 9.

6. Cerberus contends that although its consent to make the master's determination final was voluntary, the agreement was fashioned during "a single session before this Court ... without the benefit of or opportunity for any consideration or review of the applicable legal principles." Defendant's Mem. at 9. Whatever

force this observation has is considerably reduced by the fact that Cerberus reaffirmed its agreement several weeks later that the master's determination would be unreviewable. It is, of course, only after Cerberus has lost before the master that it has intimated its present view that his determination is reviewable despite the agreement.

ship. He'll decide that issue as he will every other discovery or every other substantive dispute between you. I don't have the power to do it anymore. That is the truth of it. You have an appeal to me only if he goes outside the mandate. You do not come to me in the first instance with any dispute concerning this controversy anymore. That is what you bargained for. That is what you get. *Id.* at 52.

Hearings were held before the special master from December 15, 1982 to January 20, 1983. At the beginning of the hearings, the special master, rejecting Baker's attempt to narrow the scope of the proceedings before him, correctly characterized his mandate as "to try to decide the whole case, that is all the controversy that was brought before the arbiters irrespective of the Order in which the decisions are to be made except the patent issues." Tr. of Dec. 15, 1982 at 12. Counsel for Cerberus agreed with this characterization. *Id.* On March 22, 1983, the special master issued his report, finding that Baker had not infringed Cerberus's trademark or misused Cerberus's trade secrets, and had breached the licensing agreement in only one respect: by failing to cooperate with Cerberus as required by Article XI of the agreement. Report of Special Master Richard G. Moser ("Report") at 60–64. The special master found that Cerberus had also breached the agreement by failing to cooperate as required by Article XI, and that Cerberus had defaulted on its obligation under Article IV to supply all know-how about the licensed detectors to Baker with respect to its proposed F–9 line of detectors. *Id.* at 61, 64. The master found that Baker's breach could not justify a termination of the agreement, since it had been provoked by Cerberus's attempt to deprive Baker of the benefits of its exclusive license. *Id.* at 64. Accordingly, he found that Cerberus's notice of termination of the agreement is void, that the licensing

agreement "continues in full force and effect," *id.* at 65, and that both parties should be ordered to honor the agreement, with Cerberus being enjoined from selling or permitting the sale of licensed detectors in the licensed territory. *Id.* at 62, 65. On the issue of the safety of the DI–3, the master found that it was safe for use in the environments covered by the applicable Underwriters' Laboratory standard, UL–268, but that it had not been marketed or tested long enough for there to be sufficient knowledge about its effectiveness in environments more critical than those covered by the standard and was inferior to Cerberus's DI–2D detector in manufacture, stability and resistance to natural elements. The master accordingly found that Baker should be enjoined from claiming that the DI–3 is superior or equal in quality to the DI–2D or DI–4A, that the DI–3 is a worthy successor to the DI–2D, and that the DI–3 can be effectively installed in environments other than those covered by the Underwriters' Laboratory standard. *Id.* at 62–64.

Despite its agreement that the determination of the master would be final, Cerberus, through its counsel Cravath, has filed forty pages of objections to his report, a one hundred page brief in opposition to the entry of a judgment based on the report,[7] and a sixteen page reply brief to Baker's response to its objections to the report. These voluminous submissions challenge virtually every aspect of the proceedings before the master, including discovery rulings, evidentiary rulings, the master's understanding of the issues before him for decision, and many of the master's findings of fact and conclusions of law. Cerberus's objections fall into three general categories: (1) contentions that the master exceeded the scope of the reference by deciding issues not raised in the arbitration proceeding; (2) contentions that the master's findings and conclusions are erroneous; and (3) contentions that the master violated Cerbe-

---

**7.** Submission of this memorandum by Cravath violates Rule 27 B. of the Rules of the United States District Court for the District of New Jersey, which states that "[t]he argumentative portion of the main briefs shall not exceed 30 ordinary typed or printed pages, except by special permission of the court." Leave of the court for the filing of the memorandum was neither sought nor granted.

rus's due process rights and the agreement underlying the reference by the manner in which he conducted the hearings and the discovery proceedings. In response to these objections, Baker has filed a motion pursuant to 28 U.S.C. § 1927 for the assessment of counsel fees and expenses against Cravath. Baker contends that Cerberus's objections in the face of the agreement made in open court that Mr. Moser's determination would be final and unappealable are frivolous and were filed by Cravath in bad faith. Br. in Support of Baker's motion for Costs, Expenses and Attorneys' Fees at 6. We will consider Cerberus's objections to the entry of a judgment based on the special master's report and then turn to Baker's motion for the assessment of fees.

## II. *Contentions that the Master Exceeded the Scope of the Reference*

■ As stated above, *supra* at 1241, and as recognized by the master at the beginning of the hearings before him, *supra* at 1242–1243, the parties agreed that the master would be empowered to decide any issue which would have been cognizable in the arbitration between the parties. Cerberus contends that in rendering many of his findings, the master exceeded the scope of the reference by deciding matters not in issue in the arbitration. We find, with respect to each of the findings and conclusions in the report, that the master resolved matters placed in issue by the pleadings in the arbitration proceeding.

### *Breach of Article VI(B)—Finding 4*

The master found that Article VI(B) of the agreement applies only to commercial detectors for which Baker asks for and receives production drawings, specifications or manufacturing instructions. Report at 26–27, 60–61. The master found that "Baker has not breached this provision with respect to any detector manufactured by it." *Id.* at 61. Cerberus contends that the master could only rule with respect to those detector models put in issue in the proceeding rather than as to all detectors made by Baker. Mem. of Cerberus Ltd. in Opp. to

Plaintiff's Application for Entry of an Order and Judgment ("Defendant's Mem.") at 29–30. In its response to Baker's demand for arbitration, Cerberus alleged that Baker violated Article VI(B) with respect to the DI–1A, the DI–3, the DI–4A and the DP–3. Ex. B. to Plaintiff's Response at 8–9. Cerberus nowhere indicates which detectors, other than these, are implicated by the Master's ruling—the only commercial detectors which Baker makes other than those mentioned in Cerberus's pleadings appear to be the DC–1 and, perhaps, the DI–1, and there is no indication that Cerberus has supplied drawings, specifications or instructions for these. Given this, along with the centrality of Article VI(B) to the dispute, Cerberus's allegation that Baker had "generally ignored the provisions of the agreement," and the fact that considerable evidence was introduced at the hearings concerning the DC–1, we cannot conclude that this finding exceeds the scope of the reference.

### *Cerberus's failure to provide know-how—Finding 6*

The master found that with respect to its new F–9 line of detectors Cerberus had defaulted on its obligation under Article IV of the agreement to provide useful know-how to Baker. Report at 61. Cerberus contends that this issue was not formally raised by Baker in its demand for arbitration, and is therefore outside the scope of the reference. Objections of Cerberus Limited to the Report of Special Master Richard G. Moser ("Defendant's Objections") at 10; Defendant's Mem. at 30, 91–92; Mem. of Cerberus Limited in Reply to Baker's Response to Cerberus's Objections ("Defendant's Reply Mem") at 8–10. Baker's contention that Cerberus had not supplied any know-how to it in its development of the DI–3 was central to its defense against Cerberus's charge that the manufacture of device violated Article VI(B). Testimony that Baker's request to Cerberus for information on the F–9 was rejected was elicited in questioning by counsel for Cerberus, Tr. of Dec. 21, 1982 at 219–20, who also conducted re-cross examination on the point. Tr. of Jan. 3, 1979 at 171–75. In light of

this, the issue was properly before the master for consideration.

*Cerberus's right to sell in the licensed territories—Findings 9 and 10*

The master found that since the license given by Cerberus to Baker was an exclusive one, Cerberus had no right to sell licensed inventions in the licensed territory irrespective of whether or not Baker did so, and that any refusal by Baker to permit these sales would therefore not violate the best efforts clause. Report at 62. The master found that Cerberus should be enjoined from directly or indirectly selling or permitting the sale of the licensed detectors in the licensed territory. *Id.* Cerberus contends that since the question of whether Cerberus had the right to sell licensed detectors in the licensed territories "has never been in controversy and was not raised at any time in this proceeding," the master lacked the power to make this finding. Defendant's Mem. at 30; Defendant's Objections at 12. This contention is simply erroneous: as the master recognized, Report at 40, Cerberus's own response to Baker's demand for arbitration put the matter in issue by contending Baker had breached the "best efforts" clause of the agreement by refusing "to allow Cerberus to make sales that Baker itself would not make." Ex. B to Plaintiff's Response at 10. The master's findings respond to this allegation.

Alternatively, Cerberus argues that findings 9 and 10 exceed the scope of the reference because this Court, and therefore the master, lacks the power to rule on Cerberus's ability to sell in the licensed territory since the issue is not a justiciable one. Defendant's Mem. at 88–90; Defendant's Reply Mem. at 11–12. Putting aside the question of whether the master is limited by the justiciability doctrines that govern the federal courts, the issue of Cerberus's ability to sell in the licensed territory was raised by Cerberus itself, and Cerberus's desire to abrogate the exclusive license enjoyed by Baker was stressed both by Baker in the pre-

sentation of its case and the master in his decision. Report at 11–15, 66. It was within the master's power to order relief to meet this concern.

*The Safety of the DI–3—Finding 11*

The master found that the DI–3 was "safe and of sufficient quality to justify its sale for use in the environments covered by" UL–268. Report at 62–63. Cerberus contends that the issue of the safety of the DI–3 was not before the master, but instead had been "expressly reserved to this Court." Defendant's Mem. at 31; Defendant's Objections at 13.[8] Cerberus suggests that the only issues before the master relating to the technical quality of the DI–3 were whether the device met Cerberus's quality standards and whether Baker had made false and misleading statements in promoting it. Defendant's Mem. at 34.

Cerberus's argument that the issue of the safety of the DI–3 was not before the arbitrators is meritless. The question of the technical soundness of the DI–3 was raised in Cerberus's response to the demand for arbitration, *supra* at 1240, and was central to the issue of whether Baker had breached the licensing agreement in marketing the DI–3. Indeed, at the hearing on Baker's motion for injunctive relief pending arbitration, counsel for Cerberus agreed with the Court's statement that the safety of the DI–3 was a question which the parties had put before the arbitrator. *Id.* Similarly, at the hearing at which the stipulation creating the mastership was reached, counsel for Cerberus stated that discovery relating to the issue of whether the DI–3 was a hazard to the public safety was relevant to the proceedings before the master. Tr. of Oct. 14, 1982 at 34–35. There is nothing in the record which supports an assertion that the parties agreed that the issue of the safety of the DI–3 should be removed from the jurisdiction of the arbitrators and decided by this Court; to the contrary, as indicated above, *supra* at 1240–1241, Baker strenuously resisted any consideration by this Court of

---

**8.** Cerberus does not object to finding 13, which concludes that the DI–3 has not been on the market long enough or tested sufficiently for its

effectiveness in environments more critical than those covered by UL–268 to be known. Report at 63.

the safety of the device. Thus, the stipulation cannot have "explicitly reserved" the issue to this Court.[9]

Moreover, Cerberus argued before the master that the safety of the device was in issue before him. When Cerberus sought to admit reports on the technical soundness of the DI–3, the following exchange occurred:

MR. MOSER: What is the issue before me that these are relevant to?

MR. BEERBOWER: These address the deficiencies of the DI–3 as a safe detector. They address the relevance and use of standards and standard testing organizations, and they address the DI–3 and DI–1A marketing literature—well, the misleading nature of that literature.

MR. MOSER: Well, I consider that relevant to this proceeding, . . .

Tr. of Jan. 11, 1983 at 95–97. The reports were subsequently admitted. *Id.* at 102; Tr. of Jan. 20, 1983 [II] at 73. Other evidence relating to the quality of the DI–3 was received; *see, e.g.,* Tr. of Jan. 20, 1983 [II] at 41, 56; in fact, the bulk of Cerberus's direct case concerned technical defects in the DI–3. Cerberus cannot be permitted to argue before the master that the safety of the DI–3 is a proper issue for him to consider, introduce substantial evidence on that question, and then, when it receives a finding that it does not like, argue before this court that the master could not decide the issue.

Cerberus contends that the master's finding that the DI–3 is safe for the ordinary indoor applications covered by UL–268 is based on the report issued by Prof. Emmons. Cerberus argues that this report is "seriously incomplete and misleading" when relied on in deciding the issue of the safety of the DI–3, because the context of the report's preparation and subsequent evi-

dence relating to the information submitted by Baker to Prof. Emmons was not known to the special master. Defendant's Mem. at 35–36. The omissions in Baker's submissions to Prof. Emmons, however, were made known to the master; as Cerberus's own brief suggests, this information was revealed, among other places, during cross-examination of a Baker witness at a hearing before the master. *See, e.g.,* Tr. of Jan. 19, 1983 at 104 (omission of the development failures of the DI–1). Given this, we fail to see how the master's reliance on Prof. Emmons' report to resolve the issue of the safety of the DI–3 is misleading when this is precisely the issue that the report addresses. Cerberus's contention that the master should not have relied on Prof. Emmons' report in assessing the safety of the DI–3 is even more surprising in light of the fact that Cerberus, in arguing that Baker should be assessed Prof. Emmons' fee and expenses, stated that "his findings supported the allegations we set forth, clearly one by one, right down the page." Tr. of Oct. 14, 1982 at 39. Those allegations concerned the safety of the DI–3.[10]

*Cerberus's failure to cooperate—Finding 18*

The master found that both parties had failed to cooperate with each other as required by the agreement, and that Cerberus's failure to cooperate provoked, and therefore excuses, Baker's failure to cooperate. Report at 50–51, 64. Cerberus contends that the issue of whether Cerberus failed to cooperate with Baker was never raised in the proceedings and therefore was improperly decided by the master. Defendant's Mem. at 31; Defendant's Objections at 15. This argument is also without merit. The issue of good faith is relevant to any contractual dispute. Baker's contentions that Cerberus had destroyed the coopera-

**9.** Certainly, the Court's statement that information about testing and installation of the DI–3 "sound[s] like the stuff that was before me rather than the stuff that was before the Arbitrators," Tr. of Oct. 14, 1982 at 35, does not constitute such a reservation.

**10.** Cerberus has not made clear why it is unhappy with the master's decision as to the

safety of the DI–3. As indicated above, Cerberus did not seek to enjoin the sale of the DI–3 in all of its applications, only in certain critical applications. The master has stated that marketing of the DI–3 for use in environments more critical than those covered by UL–268 should be enjoined.

tive relationship that the parties had previously enjoyed was central to its case. Further, the reasons for Baker's failure to cooperate with Cerberus were necessarily placed in issue by the allegation that Baker has been uncooperative, particularly given the master's plenary power to decide matters of remedy. Thus, the master properly considered the issue of Cerberus's failure to cooperate.

Cerberus contends that by improperly reaching the issue of whether Cerberus cooperated with Baker, the master erroneously stated that Cerberus threatened to "get around" the requirement that it gave Baker a right of first refusal on a photoelectric device by licensing it to a subsidiary. Cerberus contends that if it had known that its failure to cooperate was in issue, it would have been able to rebut the master's statement by showing that Baker was in fact given a right of first refusal. Defendant's Mem. at 33–34; Defendant's Objections at 23–24. Cerberus's proferred evidence, however, goes only to whether Baker in fact received a right of first refusal on the device. The master did not find that Cerberus denied Baker the right to first refusal on the device, only that it threatened to do so.[11]

*Computation of Royalty Payments Due— Finding 20*

The master found that Baker should be required to conduct an internal audit of its sales records and royalty reports, and set forth a set of rulings for computing the royalties due. Report at 58–59, 64–65. Cerberus contends that some of these rulings involve matters not placed in issue before the arbitrators or the special master. Defendant's Mem. at 31–32. Defendant's Objections at 26. Cerberus specifically contends that the amount of royalties due on the DC–1 was not at issue, only their timeliness, and that the master reduced Baker's

payments due in ways that Baker did not assert. *Id.* In the arbitration proceedings, however, Cerberus claimed that Baker had "breached the provisions of Article III by failing to pay the proper amounts in royalties on its manufacture, sale and/or use of 'detector devices'." Ex. B. to Plaintiff's Response at 6, 8. This allegation puts into issue whether Baker has paid the proper amount of royalties on any of its detector devices, including the DC–1. The determination of whether or not Baker's royalty payments were proper necessarily entails a determination of the proper method for computing the amount of royalties due on any particular detector device, which in turn requires the master to consider those factors which reduce the royalties due as well as those which increase them. The master's findings as to how to calculate the royalties owed by Baker are therefore clearly within the scope of the issues committed to him for determination.

*Effect of Cerberus's notice of termination—Finding 21*

The master found that the notice of termination sent by Cerberus is void *ab initio* and that the licensing agreement continues in full force and effect. Report at 65. Cerberus contends that its right to have issued the notice has been recognized both by this Court and by the United States Court of Appeals, Defendant's Mem. at 32. Defendant's Objections at 20, implying that the master therefore lacked the power to rule on the propriety of the notice of termination. This contention is frivolous. The central purpose of the arbitration, and, following the reference, the mastership, was to determine the propriety of Cerberus's declaration of the termination of the licensing agreement. Indeed, at the hearing on Baker's motion for injunctive relief, counsel for Cerberus not only agreed with the Court's view that the merits of Cerberus's claims of

---

11. The master observed that it was "obvious to an outsider" that both parties would be better off if cooperative relations between the parties resumed. Report at 51. Cerberus claims that, through his findings, the master improperly "attempted to compel the cooperative behavior he felt would be in the parties' best interest." Defendant's Mem. at 65; Defendant's Objections at 19. In making his observation, however, the master specifically noted that "[i]t is hard to persuade people to cooperate with each other if they do not want to and it would be pointless to order them to do so." Report at 51.

breach were not before this Court but also conceded that that arbitrator would have the power to restore the status quo that existed before the declaration of termination if he found that the declaration was unjustified. *Supra* at 1240. After noting the distinction between whether Cerberus had the power to terminate the agreement and whether it had the right to do so, and after stating that the question of whether Cerberus had the right to terminate turned on whether the arbitrators, who had exclusive cognizance of the issue, found a breach of the agreement by Baker, the Court relied on Cerberus's representation in rejecting Baker's argument that an injunction against the declaration of a termination by Cerberus was necessary to protect the integrity of the arbitration. Tr. of April 12, 1982 at 6–10, 35. Cerberus's contention that this Court's decision, as affirmed by the Third Circuit, to deny Baker's motion for an injunction precludes the master from ruling on the propriety of Cerberus's declaration of termination is not only clearly without merit, but is, in effect, a reneging on an assurance that was made by its counsel and relied on by the Court to Cerberus's benefit.

*Allocation of costs*

The Master, finding that "[t]he litigation is the result of Baker's attempt to defend itself against claims that are without foundation," decided that 85 percent of the costs of the proceeding before him should be paid by Cerberus, and that 15 percent should be paid by Baker. Report at 66. Cerberus contends that the master exceeded the scope of the reference in making this decision since the decision was based on findings outside the scope of his authority and since it was based on "moralistic judgments rather than legal standards." Defendant's Objections at 39. The master was clearly given the power to allocate the expenses of the proceeding before him. Tr. of Oct. 14, 1982 at 30. For the reasons stated above, we find that none of the master's findings exceeds the scope of the reference. We also find, assuming that the question is relevant, that the assessment of costs in favor of the party which has prevailed on almost all of the issues in the proceeding is consistent with "legal standards."

### III. *Objections to the Merits of the Master's Determination*

Cerberus, through Cravath, objects to a large number of the factual findings and legal conclusions of the special master. Recognizing that it clearly, unequivocally, and voluntarily agreed that the master's determination would be unreviewable both as to findings of fact and conclusions of law, Cerberus asserts that notwithstanding this agreement, the Court has "an obligation to prevent the entry of a formal judgment based upon clearly erroneous facts and manifest errors of law." Defendant's Mem. at 8–9; Defendant's Objections at 5 n. *.

■ Despite the extensiveness of the objections set forth by Cerberus to the master's factual findings, it is unclear whether it seriously presses an argument that these findings are reviewable. Despite the statement just quoted, the argumentative portion of Cerberus's brief contends only that conclusions of law are reviewable, and Cerberus cites no authority suggesting that factual findings must be reviewed as well. We therefore reject any suggestion by Cerberus that we examine the master's findings of fact.

Cerberus vigorously asserts that the Court must conduct a plenary review of the master's conclusions of law despite the parties' agreement that these conclusions would be unreviewable by any court. Its primary argument in support of reviewability can be summarized as follows. In agreeing that their dispute would be referred to a master appointed by this Court for a final determination, the parties were also agreeing that the matter would be heard by a judicial officer who would render a judicial decision "under the authority and jurisdiction" and "subject to the supervision" of the Court. Defendant's Mem. at 1; Defendant's Reply Mem. at 1. Indeed, Cerberus argues, "the instructions of the Court" to the master were to "render a

judicial determination based on the rule of law." Defendant's Mem. at 64. The master's function was therefore not, as agreed, to resolve finally the controversy between the parties, but to "aid[ ] the court in its ultimate decision-making function." *Id.* at 16, 19. Article III of the United States Constitution and Rule 53, Fed.R.Civ.P., require a district court which delegates decision-making power to a master to review the report submitted by the master to ensure that it contains no legal error. *Id.* at 11–16. Since the institutional concerns of the courts are involved, the parties' waiver of any interest they have in such a review does not affect the responsibility of the Court to conduct it. *Id.* at 17.

As applied to this case, every aspect of this analysis is fundamentally flawed. The first defect in the argument is that it seriously distorts the nature of the agreement reached by the parties in an effort to reach a result diametrically opposed to the parties' intent and this Court's understanding of the agreement. The parties clearly intended that the master not be subject to the authority and jurisdiction of this Court. At the hearing at which Mr. Moser was appointed, the Court stressed that the master was "not under my authority," that the Court had no power to decide any issue relating to the mastership except the scope of the mandate, and that the master was "in complete control of the controversy from the moment we agreed upon him as the master." *Supra* at 1242–1243. Moreover, there were no "instructions" from this Court to the master that he "render a judicial determination" as opposed to "acting

like an arbitrator," Defendant's Mem. at 23, 64; Defendant's Reply Mem. at 2–3,[12] nor is there any other indication that the parties considered the master to be a judicial officer subject to the Court's control as opposed to a neutral, detached person empowered to decide their controversy with finality. Indeed, the parties have twice agreed to have the disputes at issue here resolved without a judicial determination on the merits: first, by inserting an arbitration clause into the licensing agreement, and, second, by agreeing to a final determination by the master. The parties' intention to resolve their controversy without a judicial decision on the merits is further evidenced by their agreement that the master's judgment would be unreviewable not only by this Court, but by any court.[13]

This Court was an active participant in the negotiation which led to the agreement by which the arbitration proceedings were referred to Mr. Moser. The Court's firm understanding of the agreement, an understanding clearly supported by the record, is that the parties intended, above all, to create a mechanism which would provide them with a chance to present their cases to a neutral and detached individual who would render a final and unappealable judgment. It was clear to all that the Court's role was limited to enforcing the agreement by which the arbitration proceedings would be decided with finality by Mr. Moser, and that the Court was not to review any of his holdings which were within the scope of the reference. The argument that, in the very moment that the parties were explicitly

**12.** Cerberus repeatedly refers to the Court's statement that the master would not be an arbitrator presiding over an arbitration proceeding. Defendant's Mem. at 4, 38; Defendant's Objections at 2–3; Defendant's Reply Mem. at 3. Of course, the fact that the master was not formally termed an arbitrator does not make him a judicial officer subject to judicial review. Cerberus also fails to note the Court's statements that under the parties' stipulation, "the arbitration will, in effect, be shifted to another forum," and that the "intention of [the] agreement" was to give the parties a "faster, speedier, hopefully more competent way of arbitrating" the dispute. Tr. of Oct. 14, 1982 at 9,

**35.** The function of the master is, of course, more important than what he is called.

**13.** Cerberus argues that the parties lacked the power to agree that a judgment embodying the master's findings be unappealable. Defendant's Mem. at 92. This contention is erroneous; as stated in *Goodsell v. Shea,* 651 F.2d 765, 767 (C.C.P.A.1981), "the great weight of authority favors enforceability of agreements not to appeal from a decision of a specified tribunal." *See Sirlin Plumbing Co. v. Babylon Country Club,* 10 App.Div.2d 995, 202 N.Y.S.2d 927 (2d Dep't 1960) (enforcing an agreement not to appeal by dismissing an ensuing appeal).

agreeing to this arrangement, they were in fact implicitly agreeing that the master would render a "judicial" decision reviewable on the merits is irrational.

The second defect in Cerberus's argument is that it assumes that the power of the master to resolve the parties' differences derived from a delegation of judicial power. Cerberus argues as if this Court had once possessed the power to adjudicate on the merits the issues decided by the special master, and had then referred the matter to Mr. Moser. Thus, Cerberus argues that Mr. Moser's role, like that of any master, was to aid the court "in its ultimate decision-making power." As has been clearly recognized by both parties and by the Court throughout this litigation, however, the merits of the issues decided by the special master have never been before this Court for resolution. This Court at no time could have delegated to the master the power to decide the controversy between the parties since this court has never had any such power to delegate. The master's power to decide finally the issues raised in the arbitration instead derives from the parties' agreement to abide by his decision as final, not from anything conferred by this Court. Cerberus itself recognizes this in arguing that the "jurisdictional basis" for the proceeding before the master is eliminated by the master's failure "to enforce the agreement upon which the Order of Reference was premised." Defendant's Objections at 34. While the court has assumed jurisdiction over this action, it has done so, as recognized by counsel for Cerberus, only for the purpose of enforcing the stipulation between the parties. Tr. of Oct. 14, 1982 at 27–28.

The proper scope of judicial review in a case in which the parties have committed a matter to a decisionmaker for a final and binding determination is set forth in *United States v. Moorman,* 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950). In *Moorman,* the respondent and the Government entered into a contract under which any dispute would be decided by the contracting officer, with a right of appeal to the Secretary of War, whose decision would be "final and binding." The respondent appealed an unfavorable decision from the Secretary of War to the Court of Claims, which overturned the decision and entered a money judgment for the respondent. The Supreme Court reversed, finding that the Court of Claims had departed from the principle that when parties designate a person to render a final decision, "[f]indings of such a contractually designated agent, even where employed by one of the parties, [are] held conclusive, unless impeached on the ground of fraud, or such gross mistake as necessarily implied bad faith." *Id.* at 461, 70 S.Ct. at 290 (citing *Martinsburg & Potomac R. Co. v. March,* 114 U.S. 549, 555, 5 S.Ct. 1035, 1038, 29 L.Ed. 255 (1885)). The Court noted that its cases

> stand for the principle that parties competent to make contracts are also competent to make such agreements....

> Similar agreements have been held enforceable in almost every state.... It is true that the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language. *Mercantile Trust Co. v. Hensey,* 205 U.S. 298, 309 [27 S.Ct. 535, 539, 51 L.Ed.2d 811]. But this does not mean that hostility to such provisions can justify blindness to a plain intent of parties to adopt this method for settlement of their disputes. Nor should such an agreement of parties be frustrated by judicial "interpretation" of contracts. If parties competent to decide for themselves are to be deprived of the privilege of making such anticipatory provisions for settlement of disputes, this deprivation should come from the legislative branch of government.

*Id.* at 461–62, 70 S.Ct. at 290. The court held that review by the Court of Claims of questions of law was precluded to the same extent as its review of questions of fact. *Id.* In *United States v. Wunderlich,* 342 U.S. 98, 100, 72 S.Ct. 154, 155, 96 L.Ed. 113 (1952), the Court clarified the standard set forth in *Moorman,* stating that, in the absence of legislation limiting their ability to so agree, parties who had freely and volun-

tarily contracted to accept a decision as final could not challenge that decision except on a showing of "conscious wrongdoing, an intention to cheat or be dishonest." [14]

Thus, absent a statutory command to the contrary, courts are precluded from reviewing the merits of a decision by one to whom the parties have entrusted the resolution of a dispute. The only statute which arguably governs judicial review of Mr. Moser's decision is the United States Arbitration Act, 9 U.S.C. §§ 1–14, which sets forth the situations in which courts are precluded from confirming arbitration awards. 9 U.S.C. §§ 10–11. These provisions do not permit review of claimed errors of law. *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *National Railroad Passenger Corp. v. Chesapeake & Ohio Ry.*, 551 F.2d 136, 143 (7th Cir.1977); *cf. Kane Gas Light & Heating Co. v. International Brotherhood of Firemen, Local 112*, 687 F.2d 673, 679 (3d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983) (labor arbitration award confirmed despite the fact that court finds it "difficult . . . to comprehend the arbitrator's determination").

There is a clear distinction between situations in which a court refers a matter properly before it for decision to a master for determination and those in which the court's role is to enforce an agreement of the parties to have their disputes conclusively resolved by a third party. For example, in *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 712 F.2d 1305, 1312 (9th Cir.1983), a patent infringement action over which the federal courts had exclusive jurisdiction, the Court held that the parties could not consent to have a magistrate enter judgment without review by the district court. In doing so, the court explicitly distinguished the situa-

tion in which the parties agree that a nonjudicial officer will finally resolve their controversy. The court stated:

> When the parties use an arbiter, they do not invoke the judicial power of the United States courts. An arbiter may render a decision, but its effects flow from the parties' contractual agreement to abide by it, not from an exercise of judicial power. The arbiter has no authority to enter a judgment, and the parties must look to the courts for enforcement of an arbitration award. Also, an arbiter's decision is generally not subject to judicial review on the merits. *See, e.g. United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 [80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424] (1960). By contrast, when parties agree to trial by magistrate, they are invoking the judicial system. [note omitted]. The parties use the judicial process, and the magistrate enters a judgment in the name of the court. 28 U.S.C. § 636(c)(1), (3). The magistrate's opinion is subject to review on the merits. 28 U.S.C. § 636(c)(3)(4).

Similarly, in holding that a magistrate could preside over a civil jury trial, with the consent of the parties, as long as the district court entered the final judgment after a *de novo* review, the Seventh Circuit noted that "when a civil case properly within the jurisdiction of an article III court is tried before a magistrate pursuant to an order of reference by the district court, jurisdiction remains vested in the district court and is merely exercised through the medium of the magistrate." *Muhich v. Allen*, 603 F.2d 1247, 1251 (7th Cir.1979). The dissenting opinion noted that the case was one in which the magistrate acted "fully under the aegis of the formal judicial power of the United States as defined in Article III of the Constitution," and not one in which "private parties have agreed between themselves to submit their differences to a pri-

14. The specific result in *Moorman* and *Wunderlich* was overturned by Congress in the Wunderlich Act, codified at 41 U.S.C. § 321–22. Under this Act, a contractor, but not the Government, may obtain judicial review of questions of law notwithstanding a contractual

provision making the judgment of an administrative officer final. *See S & E Contractors, Inc. v. United States*, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). This Act is inapplicable to the present dispute.

vate dispute resolution process such as arbitration" or in which "a party seeks federal court enforcement of the outcome of a private dispute arbitration." *Id.* at 1253 (Swygert J., dissenting). In the present case, the parties have transferred the litigation from an arbitration proceeding, which would culminate in an award unreviewable on the merits, to a master, whose determination is also intended to be unreviewable on the merits.[15] Mr. Moser's findings and conclusions have not been rendered in the name of this court, which has no power to make such findings and conclusions; instead, this court's jurisdiction is invoked only to enforce his determination. While this case is unusual in form, it is legally indistinguishable from those in which enforcement of the outcome of a binding dispute resolution process is sought.

All of the cases relied on by Cerberus for its contention that we must review the master's conclusions of law are cases involving the delegation to a master or magistrate of some or all of a federal district court's judicial power to enter an appealable judgment resolving a case on the merits. *See, e.g., Pacemaker Diagnostic Clinic,* 712 F.2d at 1307; *Lorin Corp. v. Goto & Co., Ltd.,* 700 F.2d 1202, 1203 (8th Cir.1983) (diversity action for breach of contract referred to a magistrate); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1310 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (same; parties consent to trial before the magistrate); *Coolidge v. Schooner California,* 637 F.2d 1321, 1322, 1325–26 (9th Cir.), *cert. denied,* 451 U.S. 1020, 101 S.Ct. 3011, 69 L.Ed.2d 392 (1981) (consolidated admiralty action; reference to the magistrate "must only be for the purpose of aiding the district judge in the exercise of

his decision making authority"); *Polin v. Dun & Bradstreet, Inc.,* 634 F.2d 1319, 1320 (10th Cir.1980) (in banc) (diversity action in tort referred to a master after remand from the court of appeals); *Harding v. Kurco, Inc.,* 603 F.2d 813, 814 (10th Cir.1979) (per curiam) (Fair Labor Standards Act case; parties stipulate that the magistrate's judgment will be unreviewable by the district court but reviewable by the court of appeals); *Duryea v. Third Northwestern National Bank,* 602 F.2d 809 (8th Cir.1979) (per curiam) (action under the Bank Holding Company Act of 1956; magistrate's judgment can be appealed to the circuit court, but not to the district court); *Sick v. City of Buffalo, N.Y.,* 574 F.2d 689, 692–93 (2d Cir.1978) (sex discrimination case referred to magistrate for trial; magistrate was not authorized to enter final judgment; magistrate's function is "to *aid* the courts in their ultimate decisionmaking function") (emphasis added); *DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d 499, 502, 507–08 (1st Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (claims of trademark infringement and unfair competition referred to a magistrate for a hearing and determination; the parties did not clearly agree that the master's conclusions of law should be unreviewable; the court notes the "tradition" that parties may "without violation of Article III freely consent to refer cases to non-Article III officials for decision," and states that "[i]f review of arbitration awards can be limited to issues involving the integrity of the process (not the correctness of the decision) it may well be that review could be similarly limited as to consensual references for decision").[16] These cases have no applicability when a master acts as the final arbiter of a controversy rather than as an official ren-

**15.** The enforcement of arbitration awards without review on the merits conclusively refutes defendant's argument that the Court must be satisfied that the master's determination is correct before entering a judgment enforcing the report because the entry of a judgment is a judicial act. *See* Defendant's Mem. at 6, 8. As stated in *DeCosta v. Columbia Broadcasting System,* 520 F.2d 499, 505–06 (1st Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976):

If it be queried whether the dignity of Article III is being compromised by entering judgments on awards made by non-Article III personnel, the sufficient rejoinder is that judgments are entered on arbitrators' awards.

**16.** Although the question is not presented in this case, we see no difficulty with permitting parties who have submitted a matter for a judicial decision to voluntarily decide during the litigation to have the final determination

dering a judgment on behalf of a federal district judge.[17]

We therefore lack the power to consider Cerberus's contention that the master's de-

termination contains legal error. As the parties have agreed, his findings and conclusions as to the merits of the dispute are final.

rendered by a non-Article III official. If parties may waive their right to a determination by an Article III judge before a matter is put before such a judge, there is no reason why they should be precluded from waiving such a right afterwards. "Indeed, the decision to waive in the case of a consensual reference is more knowledgeable than in the case of an agreement to arbitrate a future dispute because it is made after the issue has crystallized." *DeCosta,* 520 F.2d at 505.

The argument that the institutional concerns of Article III courts require that the desire of the litigants as to how they want their disputes resolved be overridden cannot withstand analysis. When parties do not wish an issue resolved by an Article III judge, there is no case or controversy for a federal district judge to consider. In these situations, the federal courts are precluded from adjudicating that issue rather than being required to do so. Moreover, the Supreme Court has expressly rejected the notion that parties are restricted in choosing a non-Article III forum for the resolution of disputes. In *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974) (citing *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513 (1972)) the Court stated:

> An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. [note omitted]. The invalidation of such an agreement would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a "parochial concept that all disputes must be resolved under our laws and in our courts..."

In *The Bremen,* the Court also stated:

> The argument that such clauses are improper because they tend to "oust" a court of jurisdiction is hardly more than a vestigal legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals. No one seriously contends in this case that the forum-selection clause "ousted" the District Court of jurisdiction over Zapata's action. The threshold question is whether that court should have exercised its juris-

diction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement.

17. The Supreme Court cases on which Cerberus primarily relies are even more inapposite. *See Mathews v. Weber,* 423 U.S. 261, 265, 96 S.Ct. 549, 551, 46 L.Ed.2d 483 (1976) (government objects to the referral to a magistrate of an action seeking judicial review of a denial of Medicare benefits); *United States v. Raddatz,* 447 U.S. 667, 669, 100 S.Ct. 2406, 2409, 65 L.Ed.2d 424 (1980) (defendant in a federal criminal prosecution objects to the referral of a criminal suppression motion to a magistrate); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 56–57, 102 S.Ct. 2858, 2864, 73 L.Ed.2d 598 (1982) (defendant objects to the adjudication of a diversity action by a bankruptcy judge). The absence of consent and the nature of the matter to be decided were particularly important in *Northern Pipeline.* Justice Rehnquist, whose concurring opinion provided the majority necessary for decision, noted that the defendant was being "subjected against its will" to an adjudication by a bankruptcy judge, and stressed that

> the lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law. *No method of adjudication is hinted, other than the traditional common law mode of judge and jury.*

*Northern Pipeline,* 458 U.S. at 90, 102 S.Ct. at 2881–82 (Rehnquist J., concurring) (emphasis added). In dissent, Chief Justice Burger characterized the Court's "limited" holding as being

> that a "traditional" state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an "Article III court" if it is to be heard by any court or agency of the United States.

*Id. Northern Pipeline,* 458 U.S. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting). Justice White's dissent also indicates that the holding is inapplicable given litigant consent. *Id. Northern Pipeline,* 458 U.S. at 95, 102 S.Ct. at 2884 (White, J., dissenting).

#### IV. Claims that the Proceedings before the Master Violated Cerberus's Right to the Due Process of Law

Cerberus contends that the evidentiary errors made by the master in presiding over the proceedings were so egregiously erroneous that they deprived the proceedings of the fundamental fairness required by due process. Defendant's Mem. at 38. It contends that this due process violation "require[s] that this Court both vacate the Report itself and refuse to enter an Order and Judgment embodying the determinations set forth therein." Id.

Although Moorman and Wunderlich state that a review of a decision by one to whom the parties have entrusted a matter for final determination must be limited to allegations of fraud, courts which have subsequently reviewed final arbitration awards have permitted inquiries into whether the arbitrator was biased or whether the proceedings before him violated due process. See, e.g., Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 147, 89 S.Ct. 337, 338, 21 L.Ed.2d 301 (1968) (Section 10 of the United States Arbitration Act permits an inquiry into whether the arbitrator was biased); Hart v. Overseas National Airways, Inc., 541 F.2d 386, 393 (3d Cir.1976) (district court must review a labor arbitration award to ensure that it is not "obtained in violation of the defendant's due process rights or as a result of improper conduct on the part of the referee"). The courts have been careful to limit the scope of such review. Thus, in Bower v. Eastern Airlines, Inc., 214 F.2d 623, 626–27 (3d Cir.1954), cert. denied, 348 U.S. 871, 75 S.Ct. 107, 99 L.Ed. 685 (1955), the Court stated that appellant

> has alleged generally that the Board's decision was arbitrary. But examination of his specific claims as shown by his affidavits and his arguments shows that he is really talking about alleged mistakes of law and erroneous evaluation of evidence. In substance he asserts that the administrative procedure was irregular in certain of its details, that irrelevant matter was considered by the Board, that

hearsay was received, and that his own conduct of which Eastern complained was not serious enough to justify dismissal. The district court refused to consider objections of this sort. Instead, and properly, it confined itself to such inquiry as was necessary to determine whether the Board had given the plaintiff a full and fair hearing and had exercised its honest judgment in reaching its conclusions and decision on the full record.

Similarly, in Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir.), cert. denied, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968), the Court stated that:

> In an arbitration case, a court cannot act as a legal screen to comb the record for technical errors in the receipt or rejection of evidence by arbitrators, who in most cases are laymen. A fair accommodation between the words of the statute [9 U.S.C. § 10] and the characteristic nature of arbitration would require that such an error must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing.

We have have assumed for the purposes of this decision that this court has the power, notwithstanding the agreement of the parties, to consider Cerberus's due process contentions. At the Court's request, the transcripts of the hearings before the master were filed, and we have fully reviewed them. We have no hesitation in concluding that Cerberus's allegations that it was deprived of a fundamentally fair hearing are totally unwarranted.

#### Partiality

Although Cerberus does not explicitly contend that the master was biassed, it suggests that, to some extent, his findings were based on a dislike of Cerberus and Cravath rather than the evidence. Defendant's Mem. at 26; Defendant's Objections at 32. Cerberus asserts that the master made "derogatory remarks about the variety of alleged breaches and issues," id., that he speculated that Cerberus terminated an

audit because it believed that the audit "had already obtained enough to help the case," *id.*, that he criticized the length of Cerberus's cross-examination of Baker's witnesses, Defendant's Mem. at 57, and that he derogated the public safety concerns raised by Cerberus because he considered Cerberus to be a "self-appointed consumer advocate." Defendant's Objections at 32–33.

The record clearly demonstrates that any suggestion that the master was partial to Baker is without foundation. First, to the extent that Cerberus is arguing that a decisionmaker, confronted with a host of allegations which he finds to be without merit, may not state his view of the merits of the allegations because this constitutes the making of impermissible "derogatory comments" about the case, its contention is frivolous. Similarly, it is permissible for the master to make findings as to Cerberus's conduct during a particular period of time even though that action may have reflected the advice of Cravath. Second, while the master criticized the length and contentiousness of the proceedings, his remarks were directed at both counsel, and clearly were not without foundation. *See, e.g.,* Tr. of Jan. 17 at 10–11; Tr. of Jan. 20, 1983 [II] at 12. Third, the master's remarks about consumer advocates plainly had nothing to do with Cerberus. Prefacing his remarks about the safety of the DI–3, the master noted that ionization smoke detectors are not dangerous in themselves, despite past arguments by "some self-appointed consumer advocates" that they are hazardous because they use radioactive material. Report at 40. Clearly, the master was not referring to Cerberus, which manufactures and sells ionization detectors and which owns several patents on their design. Indeed, the source of the allegations about the radioactive dangers of ionization detectors was consistently identified during the hearings as Ralph Nader. Tr. of Dec. 15, 1982 at 45, 60; Tr. of Jan. 10, 1983 at 119. Moreover, far from derogating Cerberus's complaints about the safety of the DI–3, the master found that it should not be marketed for certain applications.

We therefore find no basis for attributing bias or partiality to the master.

*Notice and an opportunity to be heard*

The most fundamental guarantees of the due process clause are notice and the opportunity to be heard in a meaningful manner. *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Cerberus's contentions that the proceedings before the master deprived it of both. Defendant's Mem. at 7, 37, 48–49; Defendant's Objections at 4. We cannot agree.

Cerberus's contentions that the master ruled on issues of which it was not on notice largely parallel its contentions that the master decided issues not raised by the arbitration pleadings. Since we have found that the master did not rule on issues which were not placed in issue in the arbitration proceeding, we must reject Cerberus's contention that it was not on notice of certain matters resolved in the master's report. With respect to Article VI of the licensing agreement, Cerberus concedes that the issue of its interpretation was before the master, but contends that the master violated its right to notice by relying on an argument not advanced by Baker. The record shows, however, that Cerberus was not only aware of this possible interpretation of Article VI, but conducted cross-examination on the point. Tr. of Jan. 10, 1983 at 96–97.

As to its opportunity to be heard, Cerberus notes that its direct case took up only one of the nineteen hearing days. It contends that this inequitable distribution of hearing time resulted from the master's tolerance of expansive direct examinations of Baker's witnesses during which considerable amounts of incompetent evidence were admitted and of lengthy redirect examinations of Baker's witnesses which exceeded the scope of cross-examination. The contention that these procedures deprived Cerberus of a fair opportunity to put its case before the master is frivolous. First, Cerberus does not point to a single piece of testimonial evidence which it was denied the opportunity to present. Second, a focus

on the length of Cerberus's direct case is of little relevance given the intention of the master to try as much of the case as possible on the papers. Tr. of Jan. 18, 1983 at 9, 133–34; Tr. of Jan. 20, 1983 [II] at 26. Third, even if the rulings of which Cerberus complains were erroneous, they did not significantly increase the length of time it took Baker to present its case. Fourth, the master recognized towards the end of the hearings that the time constraints placed on the proceedings could be a problem, and offered to conduct the hearings until well into the evening. Tr. of Jan. 17, 1983 at 13. Instead, the parties reached an agreement under which Cerberus would close its direct case after presenting one witness, Baker would be limited to three witnesses on rebuttal, and Cerberus would reserve one to two days for its rebuttal and for live testimony on the royalty audit. *Id.* at 20–23. Baker in fact presented only one witness in rebuttal, and Cerberus, despite the time made available to it, called none. Thus, there is no basis for Cerberus's contention that it was deprived of a fair opportunity to be heard.

*Findings of fact*

Cerberus complains that the report of the master contains no findings of fact, and that this absence "constitutes a serious defect in the proceedings." Defendant's Mem. at 39–43. The master's report clearly contains factual findings; Cerberus itself realizes this by objecting to many of them. Cerberus's real complaint is that these findings are set forth in narrative form, rather than being separately numbered with citations to the record. By no stretch of the imagination does due process require that findings of fact be separately set forth and cross-referenced. Indeed, situations in which due process requires that there be any explanation at all of the reasons for a decision "are the exception rather than the rule." *Harris v. Rivera,* 454 U.S. 339, 344, 102 S.Ct. 460, 463, 70 L.Ed.2d 530 (1981). This contention is therefore frivolous.

*Leading questions*

Cerberus contends that the master violated its due process rights by permitting counsel for Baker to ask leading questions in the presentation of Baker's direct case. Defendant's Objections at 29; Defendant's Mem. at 56–58. The record shows that the master was aware that many of the questions asked by Baker's counsel were leading and cautioned counsel on the point, but declined to strike a question unless the leading nature of the question was "doing harm" by being an "unfair guide to the witness." Tr. of Jan. 7, 1983 at 19; Tr. of Jan. 11, 1983 at 113. Objections to the leading nature of counsel for Baker's questions were sustained on this basis on numerous occasions. *See, e.g.,* Tr. of Dec. 16, 1983 at 146, 164, 187; Tr. of Jan. 7, 1983 at 35–36. In light of this, and in light of the fact that the evidence was not being presented to a jury, Cerberus's contention is without merit. Understandably, Cerberus provides no authority to support its view that leading questions constitute a due process violation.

*Incompetent and hearsay evidence*

Cerberus contends that the master violated its due process rights by permitting Baker's witnesses to testify about matters of which they had no personal knowledge, by admitting hearsay testimony, and by allowing counsel for Baker to characterize its case before the master. Defendant's Objections at 4, 26–30; Defendant's Mem. at 43–48, 55–56. Again, however, the record shows that the master recognized early in the hearings that some of the matters testified to did not involve the personal knowledge of the witness, cautioned the witnesses about this, and stated that since the matter was being heard by him, rather than a jury, he was not striking such testimony, but instead would take into account the extent to which the witnesses testified out of personal knowledge. *See, e.g.,* Tr. of Dec. 15, 1982 at 42–43; Tr. of Dec. 20, 1982 at 6–7; Tr. of Jan. 10, 1983 at 145. Further, we note that these kinds of arguments are precisely those that the Third Circuit has stated are not properly considered by a district court in reviewing the proceedings before a person to whom the parties have entrusted

a matter for final decision. *Bower,* 214 F.2d at 626–27.

Moreover, Cerberus has made no showing that the master relied on any specific piece of allegedly incompetent testimony. In pointing to a single "glaring example" of the admission of hearsay testimony, for example, Cerberus simply misstates the record. Cerberus contends that the master permitted a Baker witness, Irving L. Ellner, to testify, without personal knowledge, that the DI–3 detector had passed certain tests when in fact it is "common knowledge" that the device had not passed the tests. Defendant's Mem. at 56; Defendant's Objections at 30. The record shows that this did not happen. Asked if the DI–3 had passed the tests, Mr. Ellner responded that it had "completed" the tests. When he was asked again if it had passed, counsel for Cerberus objected on the grounds of hearsay. At the master's insistence, counsel for Baker attempted to establish the basis for Mr. Ellner's knowledge of the device's performance on the tests. The inquiry concluded when Mr. Ellner stated that he did not know whether the DI–3 had passed the tests. At no time did he testify that the device had passed the tests, only that it had completed them. Tr. of Jan. 18, 1983 at 150–52. Cerberus also complains that the master permitted counsel for Baker to "give testimony" by "continually characterizing the merits of the case" before the master. Defendant's Objections at 29; Defendant's Mem. at 43. Cerberus specifically points to a letter sent to Mr. Moser by Baker's counsel before Mr. Moser's formal appointment. *Id.* Clearly, the master, a successful attorney who has practiced for over forty years, is aware that the statements of counsel are not evidence, an admonition that is given to juries. Cerberus evidently realized this before it received an unfavorable determination from the master: when asked if the master's receipt of the letter of which Cerberus now complains would "somehow disqualify" the master, counsel for Cerberus immediately replied that it would not. Tr. of Nov. 3, 1982 at 3. Thus, we cannot conclude that the master's exposure to evidence that may not have been admissible in a trial in a federal district court trial violated due process.

### Exclusion of witnesses

Cerberus contends that the special master failed to exclude one of Baker's witnesses, Joseph Johnson, from the hearing room while another of Baker's witnesses, James C. Hensler, testified. Cerberus contends that in so doing, the master violated Rule 615, Fed.R.Evid., and vitiated its purpose of "discouraging and exposing fabrication, inaccuracy and collusion." Defendant's Mem. at 45; Defendant's Objections at 27–28. The master found that the purposes of Rule 615 would not be served by excluding Mr. Johnson because he, like the other witnesses, had read the material covering the subject of Mr. Hensler's testimony. Tr. of Dec. 15, 1982 at 42–43. We cannot find that this ruling violated any due process right of Cerberus.

### Identification of documents

Cerberus contends that the master permitted the introduction of documents without proper authentication. Defendant's Mem. at 58–60. In the sole example it cites, the document was admitted into evidence without objection by Cerberus, Tr. of Jan. 7, 1983 at 171, and Cerberus does not suggest how any prejudice resulted from the admission of any improperly admitted documents. Thus, we cannot find a violation of Cerberus's due process rights in the master's admission of documents.

### Discovery rulings

Cerberus argues that the master in two instances improperly refused to preclude testimony offered by Baker on the grounds that related information was withheld during discovery. First, Cerberus states that during discovery Baker refused to turn over, apparently on the ground of the attorney-client privilege, documents from the files of the law firm of Sullivan & Cromwell relating to the negotiation of the licensing agreement. Cerberus states that Baker was nevertheless permitted, over Cerberus's objection, to call Martin Budd, a Sullivan & Cromwell associate, to testify about the negotiations. Second, Cerberus contends that Baker refused to disclose in-

formation about the DC–1 detector device during discovery, contending that it was irrelevant, but was permitted, over objection, to introduce evidence at the hearing about the DC–1. Cerberus contends that the master not only failed to preclude the testimony, but refused to require Baker to turn over all of the documents originally requested. Cerberus contends that the master then adopted Mr. Budd's testimony and Baker's arguments about the DC–1 in his report. Defendant's Mem. at 49–55; Defendant's Objections at 30–31, 34–38. Cerberus contends that these rulings violated not only its due process rights, but the agreement on which the reference was based, thus depriving the proceedings before the master of a jurisdictional basis. Defendant's Objections at 34; Defendant's Mem. at 93–100.

This argument is without merit. First, as Cerberus's own brief recognizes, the preferable procedure when a position asserted in discovery is later waived is to order the discovery, not to preclude the introduction of relevant evidence. Defendant's Mem. at 50. We cannot say that the master's decision in this case to order discovery rather than preclude the testimony was an improper exercise of discretion, much less a violation of due process. In fact, in argument on the matter, Cerberus stressed to the master that it had asked for production of the documents as an alternative form of relief to preclusion. Tr. of Jan. 6, 1983 at 23. Any prejudice which results from the withholding of the material in discovery must be considered; however, here the master gave Cerberus the right to withhold some or all of its cross-examination of Mr. Budd until the documents were produced. *Id.* at 96–97.

Second, we cannot find that Cerberus was ultimately deprived of any significant discovery. With respect to the material from the Sullivan & Cromwell files, Cerberus received everything except four documents. Tr. of Jan. 17, 1983 at 6. The master reviewed the four documents and found only two, which were apparently copies of the same document, to be relevant to the issues in the case. The master excluded these

documents on the grounds of privilege, after stating that "their relevance is slim enough so I don't think anybody would be harmed by excluding them." Tr. of Jan. 20, 1983 [I] at 5. With respect to the interrogatories relating to the DC–1, Cerberus nowhere indicates the significance of those interrogatories to which it did not receive answers.

Third, Cerberus's contention that the master "accepted" the argument. of Baker "that the activities of the parties with respect to the DC–1 constituted significant proof of its position regarding Article VI(B)", Defendant's Mem. at 52, is another mischaracterization of the record. In its objections to the master's report, Cerberus selectively quotes from the paragraph in which the master sets out this argument without indicating that the master clearly notes this as a "claim" of Baker rather than as his finding. Defendant's Objections at 38. In fact, in the ensuing paragraph, the master rejects Baker's "claim", finding it to be an overly narrow interpretation of Article VI. Report at 26. Thus, we cannot find that the master's discovery rulings violated Cerberus's due process rights, or that they vitiated the entire proceedings of their jurisdictional basis.

Each of the due process contentions asserted by Cravath on behalf of Cerberus is either based on erroneous or misleading characterizations of the proceedings or raises matters too trivial to be a proper part of a due process analysis. Cerberus urges us to view the master's evidentiary rulings jointly, rather than individually. Defendant's Mem. at 62. Its position is not improved, however, by the fact that it has made many frivolous objections as opposed to a few. The question of whether Cerberus was afforded the "fundamental fairness" required by due process is not even arguable.

## V. *Baker's motion for the assessment of counsel fees and expenses*

Baker has moved for an award of attorneys' fees against Cravath pursuant to 28

U.S.C. § 1927,[18] which provides that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

This section is clearly applicable where counsel multiplies and prolongs litigation by wilfully making frivolous assertions. *Colucci v. New York Times,* 533 F.Supp. 1011, 1014 (S.D.N.Y.1982). The Third Circuit has recently drawn the attention of district courts to the availability of 28 U.S.C. § 1927 as a sanction for improper actions of counsel. *Titus v. Mercedes Benz of North America,* 695 F.2d 746, 749 n. 6 (3d Cir. 1982).

■ This case is particularly appropriate for the assessment of fees pursuant to 28 U.S.C. § 1927. Despite the clear and voluntary agreement which it expressed on behalf of its client to accept the master's decision as final on those matters committed to him for decision, Cravath has filed a voluminous set of papers which attack virtually every aspect of the proceedings before the master, from his discovery rulings to his rulings in presiding over the hearings to the bulk of his factual and legal conclusions. In doing so, Cravath has considerably extended a procedure which had the primary purpose of providing the parties with a faster and less expensive way of resolving the significant disputes between them. Most of the contentions advanced by Cravath on Cerberus's behalf do not relate to matters which are allegedly outside the scope of the reference. Instead, as our discussion has shown, they involve either challenges to the merits of the master's determinations, which cannot be made given the stipulation, or frivolous contentions that Cerberus did not receive a fair hearing. Cravath contends that it has an ethical duty both to this Court and to its client to urge this Court to review the master's findings. There is no ethical duty, however, to violate a stipulation entered into in open court, and the authority which Cravath contends compelled it to do so is apposite only if its attempt to completely distort the nature of the stipulation reached is accepted. *See Acevedo v. Immigration and Naturalization Service,* 538 F.2d 918, 921 (2d Cir.1976) (duty to zealously represent a client "does not justify the assertion of frivolous positions in litigation"). We take no pleasure in sanctioning Cravath, but the integrity of the system demands that we do so.

Accordingly the costs, expenses and fees incurred by Baker in responding to the contentions advanced by Cerberus in opposition to the entry of judgment on the master's award other than those relating to whether the master decided issues not committed to him for decision will be assessed against counsel for Cerberus. The statute clearly contemplates that its sanctions shall be applied against counsel, not against the client. In order to effectuate this purpose, the Court's order will provide that Cerberus is prohibited from indemnifying its counsel for these expenses, and that its counsel is prohibited from receiving any such indemnification.

---

18. In its brief, Baker argues that fees are also awardable under Rule 11, Fed.R.Civ.P. It did not move for such an award, however. We therefore do not reach the question of whether

Rule 11 authorized the award of counsel fees prior to the effective date of its recent amendment.